No. 15-5200

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

DAVID PATCHAK,

Plaintiff-Appellant,

v.

SALLY JEWELL, in her official capacity as Secretary of the United States Department of Interior; CARL J. ARTMAN, in his official capacity as Assistant Secretary of the United States Department of the Interior, Bureau of Indian Affairs,

Defendants-Appellees,

and

MATCH-E-BE-NASH-SHE-WISH BAND OF POTTAWATOMI INDIANS,

Intervenor Defendant-Appellee.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

# INTERVENOR DEFENDANT-APPELLEE MATCH-E-BE-NASH-SHE-WISH BAND OF POTTAWATOMI INDIANS FINAL BRIEF

Conly J. Schulte
Fredericks Peebles & Morgan LLP
1900 Plaza Drive
Louisville, CO 80027
Tel: (303) 673-9600
Fax: (303) 673-9839
cschulte@ndnlaw.com

Nicole E. Ducheneaux
Fredericks Peebles & Morgan LLP
3610 North 163rd Plaza
Omaha, NE 68116
Tel: (402) 333-4053
Fax: (402) 333-4761
nducheneaux@ndnlaw.com

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a), the undersigned counsel certifies as follows:

**A. Parties and Amici.** The Plaintiff-Appellant is David Patchak. The Defendant-Appellees are Sally Jewell, in her official capacity as the Secretary of the Interior, the United States Department of the Interior, and the United States Department of the Interior Bureau of Affairs. The Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians was granted Intervenor-Defendant status in the district court and is also an Appellee in this appeal. There are no amici in this appeal.

**B. Rulings Under Review.** This is an appeal of an Order issued by the United States District Court for the District of Columbia (Hon. Richard J. Leon) entered June 17, 2015, in *Patchak v. Jewell, et al.*, 1:08-cv-1331. The Order granted Appellee's (Intervenor-Defendant's) motion for summary judgment, denied Appellant's motion for summary judgment, and denied Appellant's motion to strike the supplemental administrative record.

**C. Related Cases.** This case previously was before this Court in *Patchak v. Salazar*, 632 F.3d 702 (D.C. Cir. 2001), on appeal from a district court decision, *Patchak v. Salazar*, 646 F.Supp. 2d 72 (D.D.C. 2009). The United States Supreme Court heard this matter on a writ of certiorari and remanded to the district court in

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199 (2012). There are no other related cases pending.

Respectfully submitted,

/s/ Conly J. Schulte

Conly J. Schulte
Fredericks Peebles & Morgan LLP
1900 Plaza Drive
Louisville, CO 80027
Tel: (303) 673-9600
Fax: (303) 673-9839
cschulte@ndnlaw.com

Nicole E. Ducheneaux
Fredericks Peebles & Morgan LLP
3610 North 163rd Plaza
Omaha, NE 68116
Tel: (402) 333-4053
Fax: (402) 333-4761
nducheneaux@ndnlaw.com

Attorneys for Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............1

TABLE OF CONTENTS ........................................................................ i

TABLE OF AUTHORITIES ................................................................ iii

GLOSSARY ........................................................................................ xi

INTRODUCTION ..................................................................................1

STATEMENT OF JURISDICTION ........................................................5

STATEMENT OF THE ISSUES ..............................................................6

1. Validity of the Gun Lake Trust Land Reaffirmation Act ..............................6

2. Appellant’s Challenge to 2005 Notice of Decision ..............................6

STATEMENT OF THE CASE ..................................................................7

I. Factual Background ..................................................................7

II. Procedural History ..................................................................10

SUMMARY OF ARGUMENT ..................................................................13

ARGUMENT ..........................................................................................15

I. Congress Exercised Its Plenary Authority over Indian Affairs to Substantively Affirm the Trust Status of the Bradley Tract ..........................15

A. General Interpretive Standards and Standard of Review ............................15

B. Argument ..................................................................................16

1. The origins and extent of Congress’s authority over Indian lands ..........17

2. Congress exercised its independent plenary authority over Indian affairs when it “ratified and confirmed” the Bradley Tract’s trust status ..........................................................................21

II. The Gun Lake Act Does Not Violate the Constitution ....26

A. General Interpretative Standards and Standard of Review ....26

B. Argument ....27

1. The Gun Lake Act Does Not Violate Constitutional Separation of Powers ....28

2. The Gun Lake Act Does Not Violate the First Amendment....33

3. The Gun Lake Act Does Not Violate Mr. Patchak's Fifth Amendment Right to Due Process ....36

4. The Gun Lake Act Is Not a Bill of Attainder....38

5. A Finding of Unconstitutionality in Section B of the Act Does Not Invalidate the Act, as Section B is Severable....45

III. This Court Cannot Reach the Merits of Patchak's Challenge Under the APA ....47

A. Standards of Review ....47

B. Argument ....47

1. Judicial Review of the Secretary's 2005 Notice of Decision is Prohibited in Light of the Supreme Court's 2009 Decision in *Carcieri v. Salazar* ....48

2. Whether the Tribe Was Under Federal Jurisdiction in 1934 Requires the Secretary of Interior's Expertise as "Under Federal Jurisdiction" Is Ambiguous ....54

3. Remand to the Agency to Issue a New Decision Is Not Necessary in Light of the Existence of the 2014 Notice of Decision....57

CONCLUSION ....58

CERTIFICATE OF COMPLIANCE....60

CERTIFICATE OF SERVICE ....61

# TABLE OF AUTHORITIES

## Cases

*ACORN v. United States*, 618 F.3d 125 (2d Cir. 2010) ..........................................49

*Adams v. Hinchman*, 154 F.3d 420, 424 (D.C. Cir. 1998) .....................................43

*Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987)................................ 53, 54

**Am. Bus. Ass'n v. Rogoff*, 649 F.3d 734, 741 (D.C. Cir. 2011) .............................41

*Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008).....................55

**Antoine v. Wash.*, 420 U.S. 194, 204 (1975) ................................ 15, 27, 28, 29, 33

*Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 650, n.1 (2001).............................21

**BellSouth Corp. v. FCC*, 144 F.3d 58, 65 (D.C. Cir. 1998) ..................... 46, 49, 50

**BellSouth Corp v. FCC*, 162 F.3d 678, 683 (D.C. Cir. 1998) 45, 46, 47, 48, 49, 50

*Bill Johnson's Rests., Inc. v. N.L.R.B.*, 461 U.S. 731, 737-47 (1983)........ 15, 40, 41

*Borough of Duryea v. Guarnieri*, 131 S. Ct. 2488, 2494 (2011).............................39

*Bowen v. Kendrick*, 487 U.S. 589, 617 (1988) .................................... 30, 31, 36, 42

*Bowers v. Whitman*, 671 F.3d 905, 914 (9th Cir. 2012).................................. 43, 44

*Buckley v. Valeo*, 424 U.S. 1, 108 (1976)..............................................................54

**Bugenig v. Hoopa Valley Tribe*, 266 F.3d 1201, 1212-13 (9th Cir. 2001) (en banc), *cert. denied*, 535 U.S. 927 (2002) ......................................... 25, 26, 27, 29

*Carcieri v. Kempthorne*, 552 U.S. 1229 (2008).....................................................11

* Authorities upon which we chiefly rely are marked with asterisks.

*Carcieri v. Salazar*, 555 U.S. 379 (2009) ............................................................................................3, 11, 12, 13, 16, 22, 23, 34, 56, 57, 58, 62, 63, 64, 66, 68, 69

*Cent. N.Y. Fair Bus. Ass'n v. Jewell*, No. 6:08-cv-0660, 2015 WL 1400384, *7 (N.D.N.Y. Mar. 26, 2015) ........................................................................ 65, 67

*Cherokee Nation v. Georgia*, 30 U.S. 1, 17 (1831) ......................................... 20, 21

*Cherokee Nation v. Southern Kans. Ry. Co.*, 135 U.S. 641, 656 (1890).................20

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971).........59

*City of Sault Ste. Marie, Mich. v. Andrus*, 458 F. Supp. 465, 473 (D.D.C. 1978) ......................................................................................... 17, 20

*Cobell v. Norton*, 240 F.3d 1081, 1101 (D.C. Cir. 2001)................................ 17, 21

*Cobell v. Norton*, 392 F.3d 461, 467 (D.C. Cir. 2004)..........................................31

*Confederated Tribes of Grand Ronde Cmty.of Or. v. Jewell*, 75 F. Supp. 3d 387, 398 (D. D.C. 2014) ..................................................................... 65, 66, 67

*Confederated Tribes of Siletz Indians of Or. v. United States*, 110 F.3d 688, 698 (9th Cir. 1997) ..........................................................................................22

*Consol. Edison Co. of N.Y. v. Pataki*, 292 F.3d 338, 354 (2d Cir. 2002)................51

*Daylo v. Adm'r of Veterans' Affairs*, 501 F.2d 811, 816 (D.C. Cir. 1974) ...... 16, 42

*de Rodulfa v. United States*, 461 F.2d 1240, 1252-53 (D.C. Cir. 1972)........... 42, 43

*Dept. of Army v. Blue Fox, Inc.*, 525 U.S. 255, 260-61 (1999) ...............................32

*Ethyl Corp. v. Browner*, 989 F.2d 522, 524 (D.C. Cir. 1993) .................... 60, 68, 69

*Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)........ 16, 56, 60, 62, 68

**Foretich v. United States*, 351 F.3d 1198, 1218 (D. D.C. 2003)........ 46, 47, 48, 49

*Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51, 59 (2d Cir. 1994) ....................62

*Gonzales v. Thomas*, 547 U.S. 183, 186 (2006) .................... 62, 63, 68

*Hadix v. Johnson*, 144 F.3d 925 (6th Cir. 1998) ....................35

*I.N.S. v. Chadha*, 462 U.S. 919, 931-32 (1983) ....................54

*I.N.S. v. Orlando Ventura*, 537 U.S. 12, 15 (2002) .................... 60, 62, 68

*Johnson v. M'Intosh*, 21 U.S. 543, 574 (1823) .................... 20, 21

*Kline v. Burke Constr. Co.*, 260 U.S. 226, 234 (1922) ....................37

*Lamprecht v. FCC*, 958 F.2d 382, 385 (D.C. Cir. 1992) ....................60

**Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982) ....................42

*Martinez v. California*, 444 U.S. 277 at 281-82 (1980) ....................44

*McClanahan v. Ariz. Tax Comm'n*, 411 U.S. 164, 172 n. 7 (1979) ....................19

**McCullough v. Commonwealth of Va.*, 172 U.S. 102, 123-24 (1898) .................... 42, 43

*Menominee Tribe of Indians v. United States*, 391 U.S. 404, 410-13 (1968) ....................19

*MichGO v. Kempthorne*, 525 F.3d 23 (D.C. Cir. 2008) ....................10

*Miss. Comm'n on Envtl. Quality v. EPA*, 790 F.3d 138, 178 (D.C. Cir. 2015) .................... 30, 32, 53

*Mistretta v. United States*, 488 U.S. 361, 384 (1989) ....................30

*Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985) ....................17

*Morton v. Mancari*, 471 U.S. 535, 552 (1974) .................... 19, 28

*Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439, 1444 (D.C. Cir. 1988) ....................17

*Muwekma Ohlone Tribe v. Kempthorne*, 452 F. Supp. 2d 105, 114-15 (D.D.C. 2006) .......63

**N.Y. v. Salazar*, No. 6:08-CV-00644, 2012 WL 4364452 (N.D.N.Y. Sept. 24, 2012 ....... 58, 62, 63

**Nat'l Fuel Gas Supply Corp. v. FERC*, 899 F.2d 1244, 1249 (D.C. Cir. 1990)........ ....... 16, 56, 60, 61, 63, 64, 68

*National Coalition to Save Our Mall v. Norton*, 269 F.3d 1092 (D.C. Cir. 2001)...... ....... 32, 35, 36, 37, 38, 39, 42

*Negonsott v. Samuels*, 507 U.S. 99, 109 (1993) .......19

**Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 468 (1977)...... 45, 46, 47, 48, 51, 52

*NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 30 (1937) .......31

*No Casino in Plymouth v. Jewell*, No. 2:12-cv-01748, 2015 WL 5813694, *11-12 (E.D. Cal. Sep. 30, 2015)....... 65, 66, 67

*Panhandle E. Pipe Line Co. v. FERC*, 890 F.2d 435, 438-39 (D.C. Cir. 1989)......61

*Paramount Health Sys., Inc. v. Wright*, 138 F.3d 706, 710 (7th Cir. 1998)............35

*Patchak v. Salazar*, 132 S. Ct. at 2199 (2012)....... 12, 41, 43, 45, 57

*Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218 (1995) ....... 33, 35, 37, 42

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2071 (2012) ....... 24, 34

*Regan v. Time, Inc.*, 468 U.S. 641, 652 (1984) ....... 53, 54

*Roberts v. United States*, 741 F.3d 152, 157-58 (D.C. Cir. 2014).......55

*Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429, 438 (1992) .... 15, 33, 35, 37, 38

*Roeder v. Islamic Republic of Iran*, 195 F.Supp.2d 140, 164 (D. D.C. 2002) *aff'd,* 333 F.3d 228 (D.C. Cir. 2003)........................................................................35

*Ruiz v. United States*, 243 F.3d 941 (5th Cir. 2001)................................................35

*Sandy Lake Band of Miss. Chippewa v. United States*, 714 F.3d 1098 (8th Cir. 2013)...................................................................................................................65

*Sandy Lake Band of Miss. Chippewa v. United States*, No. 00-2786, 2012 WL 1581078, *8, n.1 (D. Minn. May 4, 2012) ................................................. 65, 67

*Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 60 (1978)........................................18

*SeaRiver Mar. Fin. Holdings, Inc. v. Mineta*, 309 F.3d 662, 674-76 (9th Cir. 2002) ........................................................................................................... 50, 51

*SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943).................................. 60, 62, 64, 68

*Selective Serv. Sys. v. Minn. Pub. Interest Research Group*, 468 U.S. 841, 852 (1984)............................................................................................ 15, 46, 48, 50

*Sierra Club v. Van Antwerp*, 560 F. Supp. 2d 21, 23 (D. D.C. 2008).............. 59, 68

**Sioux Tribe of Indians v. United States*, 316 U.S. 317, 326 (1942).......... 14, 20, 22

*Stand Up for Cal.! v. U.S. Dept. of Interior*, 919 F. Supp. 2d 51, 66-67 (D.D.C. 2013) ..................................................................................... 65, 66

*Swayne & Hoyt v. United States*, 300 U.S. 297, 301-02 (1937)..............................29

*Tex. Rural Legal Aid, Inc. v. Legal Servs. Corp.*, 940 F.2d 685, 688 (D.C. Cir. 1991)...................................................................................................................55

*Trujillo v. Gen. Elec. Co.*, 621 F.2d 1084, 1086 (10th Cir. 1980)...........................59

*United States v. Bland*, 472 F.2d 1329, 1334 (D.C. Cir. 1972)...............................31

**United States v. Klein*, 80 U.S. 128, 146 (1871)...................................... 32, 37, 38

*United States v. Lara*, 541 U.S. 193, 200 (2004)....................................................19

*United States v. Lovett*, 328 U.S. 303, 308-14 (1946) ....................51

*United States v. Morrison*, 529 U.S. 598, 607 (2000) ....................30

*United States v. Sandoval*, 231 U.S. 28, 46 (1913) ....................19

*United States v. Schooner Peggy*, 1 Cranch 103 (1801) ....................38

*United States v. Turner*, 337 F. Supp. 1045, 1047 (D.D.C. 1972) .................... 31, 32

*United Tribe of Shawnee Indians v. United States*, 253 F.3d 543, 551 (10th Cir. 2001) ....................62

*Warth v. Seldin*, 422 U.S. 490, 498 (1975) ....................44

*Wash. v. Confederated Bands & Tribes of Yakima Indian Nation*, 439 U.S. 463, 470-74 (1979) ....................19

**Statutes**

25 U.S.C. § 1300j-5 ....................23

25 U.S.C. § 1754 ....................23

25 U.S.C. § 1771d ....................23

25 U.S.C. § 1777d ....................24

25 U.S.C. § 1780g ....................24

25 U.S.C. § 2710 ....................9

25 U.S.C. § 461 et seq. ....................1

25 U.S.C. § 465 .................... 8, 21, 22

25 U.S.C. § 479 ....................22

25 U.S.C. § 640d-9 .....24

25 U.S.C. §1724 .....23

5 U.S.C. § 702 .....32

5 U.S.C. § 705 .....4

**Regulations**

25 C.F.R. Part 83 .....7

**Treatises**

62 Fed. Reg. 38113-115 (July 16, 1997) .....7

63 Fed. Reg. 56936-01 (Oct. 23, 1998) .....8

65 Fed Reg. 13298-01 (Mar. 13, 2000) .....8

70 Fed. Reg. 25596 (May 13, 2005) ..... 9, 18, 25, 56

74 Fed. Reg. 18397-89 (Apr. 22, 2009) .....9

81 Fed.Reg. 5021 (Jan. 29, 2016) .....7

Act of 1871 (16 Stat. 544, 566) ..... 27, 28

Act of Feb. 28, 1877, 19 Stat. 254 .....27

Act of Mar. 3, 1891, 26 Stat. 1027, 1029 .....27

Black's Law Dictionary 1135 (5th ed. 1979) .....26

Black's Law Dictionary at 270 .....26

Black's Law Dictionary (10th ed. 2014) .....43

Cohen's Handbook of Federal Indian Law, § 15.07 [1][a], at 1039-40 (Nell Jessup Newton ed. 2012) .......... 11, 56

Cohen's Handbook of Federal Indian Law, § 5.04 .......... 21

Cong. Rec. H7485 (daily ed. Sept. 15, 2014) .......... 10, 48, 50, 52

Curtis Act, 30 Stat. 495 .......... 27
General Allotment Act of 1887, 24 Stat. 388 .......... 21

Pub. L. No. 107-111 .......... 36

Pub. L. No. 113-179, 128 Stat. 1913, Sec. 2(a) (2014) .......... passim

S. Rep. 113-194 at 2 (2014) .......... 45, 48, 49, 52

The Meaning of "Under Federal Jurisdiction" for Purposes of the Indian Reorganization Act, issued on ***March 12, 2014***. 2014 WL 988828 .......... 57, 67

Treaty Clause, art. II, § 2 .......... 19

U.S. Const., art. I, § 8 .......... 19

# GLOSSARY

| | |
|---|---|
| Act | Gun Lake Trust Land Reaffirmation Act |
| APA | Administrative Procedure Act |
| AR | Administrative Record |
| BIA | Bureau of Indian Affairs |
| Gun Lake Act | Gun Lake Trust Land Reaffirmation Act |
| IRA | Indian Reorganization Act |
| SAR | Supplemental Administrative Record |

## INTRODUCTION

Since David Patchak initiated this lawsuit in 2008, this controversy has revolved around a single question: whether a 147-acre tract of land known as the Bradley Tract is lawfully held in trust by the United States for the benefit of the Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians ("Gun Lake Tribe" or "Tribe"). If the answer to this question is *yes*, then this controversy is conclusively resolved in favor of the Gun Lake Tribe.

The power to define and create Indian trust land resides exclusively in the United States Congress as a function of its plenary authority over Indian affairs as delineated in the Constitution. While Congress has delegated limited authority to the Secretary of Interior to acquire trust land on behalf of Indian tribes subject to substantive restrictions enacted in the Indian Reorganization Act, 25 U.S.C. § 461 et seq. ("IRA"), Congress retains its own authority to declare Indian lands to be in trust free from limitations it has imposed on the Executive Branch. Consequently, notwithstanding the IRA or any prior Secretarial trust acquisition, provided it has otherwise conformed to constitutional norms, if Congress declares Indian land to be held in trust, ***it is in trust***.

This controversy began when Patchak sued under the Administrative Procedure Act ("APA") to challenge the Secretary's authority to take the Bradley Tract into trust alleging that the Secretary had exceeded the substantive limitations

set forth in the IRA. While this case was pending, Congress exercised its plenary and exclusive authority to create and define Indian trust lands, and both ***declared the Bradley Tract to be held in trust and withdrew the jurisdiction of the courts to hear any challenges.*** The Gun Lake Trust Land Reaffirmation Act, therefore, conclusively resolves this litigation.

In an effort to breathe new life into his challenge, Patchak fundamentally misunderstands the power of Congress over Indian affairs. He attempts to persuade this Court that Congress's specific delegation of authority to the Secretary in the IRA has somehow restrained Congress's own authority, despite the fact that neither the plain text of the IRA nor any authority interpreting the IRA supports this theory. Patchak relies upon the false assumption that Congress lacks independent authority to declare Indian trust land, because without it, his constitutional challenges fail. The Gun Lake Act is a substantive rule as to the trust status of the Bradley Tract, which Congress explicitly intended to promote the self-sufficiency and well-being of the Gun Lake Tribe. It does not, therefore, violate separation of powers, it is not a bill of attainder, and it does not violate either Patchak's First Amendment right to Petition or his Fifth Amendment Due Process right. His constitutional claims lack any merit whatsoever.

Patchak's failure to comprehend fundamentals does not end here. Ignoring the clear effect of the Gun Lake Act, he proceeds to the merits of his APA claim,[1] which is fatally anachronistic. He premises his challenge of a ***2005*** agency decision upon intervening authority upon the Supreme Court's ***2009*** decision in *Carcieri v. Salazar*, 555 U.S. 379 (2009), which held for the first time that the Secretary's authority to take land into trust was limited to tribes "under federal jurisdiction" in 1934. However, judicial review plainly may not proceed on an agency decision where intervening law has altered the legal framework upon which that decision was based. Instead, the agency must revise its decision consistent with the new legal framework. A revised decision actually exists, in which the agency applied the new *Carcieri* analysis in ***2014***, which Patchak sought to strike as an improper supplemental administrative record. Should this Court determine that the Gun Lake Act is ineffective, then it still cannot proceed to the merits of Patchak's challenge to the 2005 decision as presented here. Instead it must remand for judicial review of the agency decision that actually applies the *Carcieri* case, and which comprehensively supports the Secretary's authority to the take land into trust on behalf of the Gun Lake Tribe.

---

[1] This is not even properly before this Court in light of the fact that the court below declined to reach it.

Ultimately, Patchak's appeal appears to be a pretext for extracting a monetary settlement from the Gun Lake Tribe—a remedy that is not permitted under the APA. 5 U.S.C. § 705.[2] Regardless of Patchak's motives, Congress has acted independently and within its constitutional authority to both declare the Bradley Tract to be in trust and divest the courts of jurisdiction such that the merits of Patchak's appeal fails.

---

[2] Patchak's counsel informed the district court that this litigation is directed at extracting monetary compensation from the Tribe. JA) 264-65 ("A monetary settlement is exactly what [Patchak] is looking for.").

## STATEMENT OF JURISDICTION

Appellant's Opening Brief accurately sets forth the basis for appellate jurisdiction.

## STATEMENT OF THE ISSUES

### 1. Validity of the Gun Lake Trust Land Reaffirmation Act

Whether the district court correctly held that the Gun Lake Trust Land Reaffirmation Act conclusively resolved the instant litigation by declaring the Bradley Tract to be in trust and by divesting the judiciary of jurisdiction to hear challenges to the Bradley Tract's trust status;

### 2. Appellant's Challenge to 2005 Notice of Decision

Whether this Court may address the substance of Appellant's APA claim where the district court declined to rule upon it and Appellant has improperly challenged a stale agency decision.

## STATEMENT OF THE CASE

### I. Factual Background

The Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians is a federally-recognized Indian tribe whose members descend from a band of Pottawatomi Indians led by Chief Match-E-Be-Nash-She-Wish who occupied present day western Michigan. JA A21-A22; 81 Fed.Reg. 5021 (Jan. 29, 2016). The Tribe has been recognized by the federal government since the earliest years of the United States. JA A21-A22; JA A78. Between 1795 and 1855, the Tribe was a party to sixteen treaties with the United States, which the Tribe negotiated as an independent sovereign. *Id.* Like many tribes, however, the Gun Lake Tribe suffered the effects of the ill-conceived federal Indian policy of the 19th and early 20th centuries, as well as encroachment by non-Indians, and were ultimately completely dispossessed of their lands. JA A78-A81.

After existing for decades in a state of landlessness and political limbo resulting from the mistakes of the BIA, the Tribe sought reaffirmation of its sovereign status under modern federal acknowledgment procedures in 25 C.F.R. Part 83. JA A22; 62 Fed. Reg. 38113-115 (July 16, 1997). On October 23, 1998, the Secretary of Interior issued a Notice of Final Determination that the Tribe "exists as an Indian tribe within the meaning of Federal law." JA A22; 63 Fed. Reg. 56936-01 (Oct. 23, 1998). The Final Determination became effective on August 23, 1999.

65 Fed Reg. 13298-01 (Mar. 13, 2000). However, while the United States formally had acknowledged the Tribe's sovereign status, the Tribe still lacked trust land on which to house its government and its people. JA A78-A81. In 2001, the Tribe identified a 147-acre tract of land, known as the "Bradley Tract," that it hoped to place into trust as an initial reservation and on which to build an economic development project to support the Tribal government and tribal membership. JA A22. On August 8, 2001, the Tribe submitted an application asking the Secretary of Interior to take the Bradley Tract into trust pursuant to the authority delegated to the Secretary in Section 5 of the IRA, 25 U.S.C. § 465. JA A22-A23.

The Tribe's application described the dire economic hardship that years of landlessness had wrought. The Tribe struggled to provide governmental services, infrastructure, and adequate housing for its tribal members. JA A57. Tribal unemployment was more than six times higher than the broader community and only 26% of tribal members owned their homes compared to 82.9% in the county at large. *Id*. The Tribe's application explained that, in addition to entitling the Tribe to crucial services only available to tribes with trust lands, the trust acquisition would enable it to operate gaming under the Indian Gaming Regulatory Act, and therefore provide an economic base from which to administer governmental services to its members and create jobs for both tribal members and nonmember residents of the community.

JA A57, SJA 1-2[3]. On May 13, 2005, the BIA published notice of the Secretary's final decision accepting the Bradley Tract in trust to "be used for the purpose of construction and operation of a gambling facility." JA A22-A23; 70 Fed. Reg. 25596 (May 13, 2005).

Since the Notice issued, continuous litigation over the Secretary's authority to effect the trust acquisition has clouded the Tribal land base with uncertainty. Nevertheless, after the Secretary finalized the trust acquisition in January 2009, the Tribe entered into a Tribal-State Gaming Compact with the State of Michigan pursuant to the Indian Gaming Regulatory Act, 25 U.S.C. § 2710(d)(1)(c). The Compact, which was negotiated by Michigan's Governor, approved by Michigan's legislature, and then approved by the Secretary of the Interior (74 Fed. Reg. 18397-89 (Apr. 22, 2009)), includes a revenue-sharing agreement under which the Tribe shares a substantial portion of casino revenues with State and local governments. JA A247. The Gun Lake Casino opened on February 10, 2011. *Id.* The Tribe undertook approximately $195,000,000.00 in debt to construct and equip the casino, of which $54,000,000.00 was unpaid in 2014. JA A246. Since opening, the casino has created nearly 1,000 jobs for tribal members and the broader community, in addition to contributing more than $52,000,000 to State and local revenue sharing boards. JA A247; Cong. Rec. H7485 (daily ed. Sept. 15, 2014) (statement of Rep. Grijalva).

[3] SJA refers to Supplemental Joint Appendix

Most importantly, the Bradley Tract is the Tribe's reservation. And the casino built upon it funds the most basic functions of the Tribe's government, enabling the Tribe to provide essential services to its members, including housing, health care, education, and infrastructure. JA A247.

## II. Procedural History

The first challenge to the Bradley Tract was brought by the anti-Indian gaming organization MichGo in 2005, as here, challenging the Secretary's authority to effect the trust acquisition. *MichGO v. Kempthorne*, 525 F.3d 23 (D.C. Cir. 2008). When MichGo's suit failed, Mr. Patchak took up the fight, bringing the instant challenge. But Mr. Patchak entered the fight armed with a new legal theory that MichGo had failed to timely raise. Since the IRA's enactment in 1934, the Secretary and the courts had understood that the Secretary enjoyed authority to take land into trust for ***all*** tribes that were formally federally-recognized. Cohen's Handbook of Federal Indian Law, § 15.07 [1][a], at 1039-40 (Nell Jessup Newton ed. 2012). In February 2008, however, the Supreme Court granted the State of Rhode Island's petition for certiorari to consider for the first time whether the IRA limited the Secretary's authority to accept land into trust to only those tribes "under federal jurisdiction" in 1934. *Carcieri v. Kempthorne*, 552 U.S. 1229 (2008). Patchak's Complaint, filed on August 1, 2008, therefore challenged the Secretary's authority to effect a trust acquisition for the Gun Lake Tribe under the theory that it was not "under federal

jurisdiction" in 1934. JA A19-A20. On February 24, the Supreme Court adopted this interpretation of the IRA. *See Carcieri v. Salazar*, 555 U.S. 379 (2009).

The Supreme Court's ***2009*** decision in *Carcieri* substantively changed the legal framework surrounding the Secretary's delegated authority to take land into trust on behalf of Indians, and yet Patchak's suit had challenged the Secretary's ***2005*** Notice of Decision which, of course, had not applied the *Carcieri* analysis. *See* JA A17-A27. But the district court did not reach the merits, as the parties first litigated threshold procedural issues. JA A166-A177. These preliminary disputes ultimately resulted in a Supreme Court ruling that Patchak had standing and that the Quiet Title Act did not bar his suit. *Patchak v. Salazar*, 132 S. Ct. at 2199 (2012). The Supreme Court remanded to the district court to consider whether the Tribe was "under federal jurisdiction" in 1934 pursuant to its decision in *Carcieri*. *Id*. Patchak inexplicably waited for more than two years after remand before taking any action in the district court (JA A180-A182), and a status conference was not held until September 4, 2014 (JA A253-A274).

Two critical events occurred during this period of inactivity. First, on September 3, 2014, the Secretary of Interior issued an Amended Notice of Decision concerning the Tribe's fee-to-trust application for two different parcels. In the Amended Notice of Decision, the Secretary of Interior specifically considered whether the Tribe was "under federal jurisdiction" in 1934 pursuant to *Carcieri*

consistent with the Interior Solicitor's interpretation of this question. JA A187-A228. The Secretary concluded that the Tribe was under federal jurisdiction in 1934 such that she enjoyed authority to take land into trust on the Tribe's behalf under the IRA. The United States raised the new agency decision at the September 4, 2014 status conference, advising the court that the 2005 Notice of Decision was inadequate to support a *Carcieri*-based review, but that the Secretary had issued a new decision that engaged in the proper analysis. JA A253-A274. The United States later lodged that decision with the court (JA A149-A150), and Patchak moved to strike it alleging that it constituted an improper supplemental administrative record (JA A229-A233).

Second, on September 26, 2014, President Obama signed into law the Gun Lake Trust Land Reaffirmation Act, declaring that the Bradley Tract "is reaffirmed as trust land, and the actions of the Secretary of the Interior in taking that land into trust are ratified and confirmed." Pub. L. No. 113-179, 128 Stat. 1913, Sec. 2(a) (2014). Congress further provided that "[n]otwithstanding any other provision of law, an action (including an action pending in Federal court as of the date of enactment of this Act) relating to the [Bradley Tract] shall not be filed or maintained in a Federal court and shall be promptly dismissed." *Id*. at 2(b).

The parties submitted summary judgment briefing on both the effect of the Gun Lake Act and the merits of Patchak's APA claim. The district court held that

the Gun Lake Act divested it of jurisdiction to hear Patchak's challenge and that it was also constitutional. JA A294. The court therefore declined to reach both the merits of Patchak's APA claim and Patchak's Motion to Strike. *Id.*

## SUMMARY OF ARGUMENT

Patchak attempts to misdirect this Court by addressing the issues out of order. His brief first addresses his APA challenge to the Secretary's 2005 trust acquisition, then the validity of the Gun Lake Act, and then the 2014 Notice of Decision that Mr. Patchak had moved to strike below. However, the Court need not reach the merits of Patchak's APA claims or the denial of his Motion to Strike, because the Gun Lake Act is constitutional, rendering such claims moot.

This Court must start its analysis with Section A of the Gun Lake Act, by which Congress conclusively has declared the Bradley Tract to be in trust. Pub. L. No. 113-179. This direct and independent exercise of its authority to create and define Indian trust land is among Congress's core constitutional prerogatives deriving from its plenary and exclusive power over Indian affairs. *See Sioux Tribe of Indians v. United States*, 316 U.S. 317, 326 (1942). And when Congress defines Indian trust land in this way, it does so as a direct exercise of its own plenary authority and wholly apart from the limited power that it has delegated to the Secretary in the IRA (*see* 25 U.S.C. 462 *et. seq.*), even when it does so by "ratifying and confirming" a Secretarial trust acquisition (*Antoine v. Wash.*, 420 U.S. 194, 204

(1975).) The Gun Lake Act therefore has effected a substantive rule, the result of which is that the land is lawfully in trust notwithstanding any questions of whether the Secretary of Interior had authority to take the land into trust in 2005. The Act is conclusive. Mr. Patchak's challenge is a nullity.

In light of Congress's clear constitutional power to enact such a substantive change in Section A, Patchak's constitutional challenges to the Act's prohibition on judicial review in Section B fail completely. The substantive effect of Section A completely forecloses Patchak's separation of powers and First Amendment claims (*see Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429, 438 (1992); *Bill Johnson's Rests., Inc. v. N.L.R.B.*, 461 U.S. 731, 737-47 (1983)), Congress's demonstrated legislative intent to benefit the Tribe defeats his bill of attainder claim (*see Selective Serv. Sys. v. Minn. Pub. Interest Research Group*, 468 U.S. 841, 852 (1984)), and Patchak cannot establish a property right in his mere standing to sue, and thus his Fifth Amendment claim also fails (*see, e.g., Daylo v. Adm'r of Veterans' Affairs*, 501 F.2d 811, 816 (D.C. Cir. 1974)). Patchak cannot meet his heavy burden of defeating the Act's constitutionality.

Finally, even if this Court determines that Congress lacked sufficient authority to declare the Bradley Tract to be in trust, and that jurisdiction exists to hear the merits of Patchak's case, it cannot rule upon the merits of Patchak's APA challenge, as the law prohibits judicial review of the 2005 Notice of Decision in light of the

Supreme Court's 2009 decision in *Carcieri v. Salazar*, 555 U.S. 379. *See, e.g., Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). *Carcieri* has changed the legal background against which the Secretary rendered her decision on the Bradley Tract, the decision that forms the entire basis of Mr. Patchak's APA challenge. And while Patchak would have this Court apply this intervening authority to an agency decision that predates it, judicial review may only proceed upon a *Carcieri*-based decision. *See, e.g., Nat'l Fuel Gas Supply Corp. v. FERC*, 899 F.2d 1244, 1249 (D.C. Cir. 1990). If Patchak is permitted to press the merits of this case, then this Court must remand for judicial review of the 2014 decision.

## ARGUMENT

### I. Congress Exercised Its Plenary Authority over Indian Affairs to Substantively Affirm the Trust Status of the Bradley Tract

#### A. General Interpretive Standards and Standard of Review

Cases involving Indian law are guided by an interpretive principle that generally defeats any contrary presumptions or standards of review: "The governing canon of construction requires that 'statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.'" *Cobell v. Norton*, 240 F.3d 1081, 1101 (D.C. Cir. 2001) (quoting *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985); *see also Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439, 1444 (D.C. Cir. 1988) (noting that "the standard principles of statutory construction do not have their usual force in cases involving Indian law"

where the Indian canon applies). Furthermore, courts evaluating whether certain land properly has been placed into trust on behalf of an Indian tribe must "'***tread lightly***' so as to avoid infringing on this area reserved to Congress." *City of Sault Ste. Marie, Mich. v. Andrus*, 458 F. Supp. 465, 473 (D.D.C. 1978) (quoting *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 60 (1978) (emphasis added)).

**B. Argument**

The Gun Lake Act provides as follows:

> (a) In General—The land taken into trust by the United States for the benefit of the Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians and described in the final Notice of Determination of the Department of the Interior (70 Fed. Reg. 25596 (May 13, 2005)) is reaffirmed as trust land and the actions of the Secretary are ratified and confirmed.
>
> (b) No Claims—Notwithstanding any other provision of law, an action (including an action pending in a Federal court as of the date of enactment of this Act) relating to the land described in subsection (a) shall not be filed or maintained in a Federal court and shall be promptly dismissed.

Pub. L. 113-179, 128 Stat. 1913.

Section A substantively declares the Bradley Tract to be lawfully in trust and Section B divests the courts of jurisdiction to hear further challenges. Mr. Patchak has brought his constitutional challenges based solely upon Section B, but as set forth herein, Section A is sufficient, standing alone, to definitely resolve this litigation, as it is a valid exercise of Congress's plenary authority to define and create

Indian trust land. Section A, therefore, conclusively establishes the Bradley Tract's trust status and defeats Mr. Patchak's challenge.

### 1. The origins and extent of Congress's authority over Indian lands

Congress enjoys "plenary and exclusive" authority to legislate with respect to Indian tribes. *United States v. Lara*, 541 U.S. 193, 200 (2004); *see also Negonsott v. Samuels*, 507 U.S. 99, 109 (1993); *Wash. v. Confederated Bands & Tribes of Yakima Indian Nation*, 439 U.S. 463, 470-74 (1979). This authority derives specifically from the Indian Commerce Clause, U.S. Const., art. I, § 8, cl. 3 and the Treaty Clause, art. II, § 2, cl. 2. *E.g., Lara*, 541 U.S. at 200 (citing *Morton v. Mancari*, 471 U.S. 535, 552 (1974); *McClanahan v. Ariz. Tax Comm'n*, 411 U.S. 164, 172 n. 7 (1979)). This authority is so broad that Congress can both create and extinguish the very sovereign existence of the Indian tribes. *E.g., United States v. Sandoval*, 231 U.S. 28, 46 (1913); *see, e.g., Menominee Tribe of Indians v. United States*, 391 U.S. 404, 410-13 (1968).

Among Congress's broad powers over Indian affairs is its comprehensive authority over tribal lands. *Sioux Tribe*, 316 U.S. at 326. Indeed, the power to dispose of Indian lands lies "***exclusively in Congress*** . . . ;" and any executive power over Indian lands "must be traced to Congressional delegation of its authority." *Id*. (emphasis added). Congress therefore exercises its exclusive authority over Indian

lands expansively and unilaterally.[4] And critically, it is Congress's authority to acquire land on behalf of tribes and place it into trust for the benefit of the Indians. *E.g.*, *Sioux Tribe*, 316 U.S. at 326; *City of Sault Ste. Marie*, 458 F. Supp. at 473.

The core concept of Indian trust land has existed since the earliest days of the United States, including the notion that tribes have only a possessory right to lands for which the United States owns the fee and the United States' trust responsibility for these lands. *See Johnson v. M'Intosh*, 21 U.S. 543, 574 (1823); *Cherokee Nation v. Georgia*, 30 U.S. 1, 17 (1831); *see also* Cohen's Handbook of Federal Indian Law, § 5.04[3][a], at 413 (explaining that *Johnson* and *Cherokee Nation* "sowed the seeds for the modern doctrine that the interest of the United States in tribal property . . . carries with it the authority to manage tribal property and imposes duties on the government with respect to tribal and individual Indian property"). Congress first defined Indian trust land using ***modern*** terminology beginning in the late 19th century, most prominently in the General Allotment Act of 1887, 24 Stat. 388, under which "beneficial title of the allotted lands vested in the United States as trustee for individual Indians" for a period of time after issuance of the trust patent. *Cobell*, 240 F.3d at 1087. The General Allotment Act, however, was part of a broader assimilation policy that devastated tribes and tribal lands, which Congress sought to

---

4 *See, e.g., Cherokee Nation v. Southern Kans. Ry. Co.*, 135 U.S. 641, 656 (1890) (upholding Congress's power to unilaterally dispose of Indian lands).

reverse in 1934 by enacting the IRA. *Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 650, n.1 (2001). This new policy included a general delegation of authority to the Secretary of Interior, in Section 5 of the IRA, 25 U.S.C. § 465, to acquire land on behalf of the Indians to be held in trust "for the purpose of providing land for Indians." 25 U.S.C. § 465. This general grant of authority to the Secretary is limited by the definition of Indian contained in Section 19 of the Indian Reorganization Act, 25 U.S.C. § 479, which the Supreme Court construed in *Carcieri* to mean tribes "under federal jurisdiction" in 1934. *Carcieri*, 555 U.S. at 395.

Despite this ***general*** delegation of authority to the Secretary in the IRA, it is beyond dispute that Congress retains its plenary authority over the disposition of Indian lands generally and the creation of Indian trust lands specifically. *See Sioux Tribe*, 316 U.S. at 326; *Confederated Tribes of Siletz Indians of Or. v. United States*, 110 F.3d 688, 698 (9th Cir. 1997). The IRA does nothing more than delegate authority that already exists in Congress pursuant to the Constitution to the Executive Branch to exercise in a substantively limited way. This is clear on the face of the IRA. Nowhere in the IRA does Congress limit its own constitutionally-derived power to create or define trust land. Nowhere in the IRA does Congress impose upon itself the substantive restrictions contained in Section 19 that limit trust acquisitions to tribes under federal jurisdiction in 1934. Such provisions simply do not exist. The operation of Section 19 on trust acquisition authority applies only to

the Secretary, a concept that the Supreme Court in *Carcieri* well understood when it strictly limited its analysis of the definition of "Indian" in the Section 19 of the IRA to the Secretary's delegated authority in Section 5 of the IRA. *Carcieri*, 555 U.S. at 387-96.

As Congress has never restricted its own authority to create and define Indian trust land, since the IRA's enactment, Indian trust land can be created in ***two ways***: (1) by the Secretary pursuant to the IRA and subject to the limitations delineated in the IRA; and (2) as a direct exercise of Congress's plenary and exclusive authority over Indian lands, wholly free from any limitations in the IRA. Unsurprisingly, therefore, Congress routinely enacts specific legislation defining specific lands as held in trust for specific tribes, even after the enactment of the IRA, and such acquisitions are entirely divorced from the substantive limitations set forth in the IRA.[5]

[5] The instances in which Congress has so legislated are many, but include the following: 25 U.S.C. § 1300j-5 (specifically defining lands held by the Pokagon Band of Potawatomi Indians as in trust); 25 U.S.C. § 1754(2), (7) (specifically defining lands acquired pursuant to that statute as held in trust for the benefit of the Mashantucket Pequot Tribe); 25 U.S.C. §1724(3)(d) (specifically defining lands acquired pursuant to that statute as held in trust for the benefit of the Passamaquoddy Tribe, the Penobscot Tribe, and the Houlton Band of Maliseet Indians); 25 U.S.C. § 1771d(d) (specifically declaring lands held by the Wampanoag Tribe as in trust); 25 U.S.C. § 1777d(c) (specifically declaring that certain lands "shall be held in trust" for the benefit of the Santo Domingo Pueblo; 25 U.S.C. § 1780g (specifically declaring that certain lands "shall be held in trust" for the benefit of the San Ildefonso Pueblo); 25 U.S.C. § 640d-9 (specifically declaring that certain lands "shall be held in trust" for the benefit of the Navajo and Hopi Tribes).

Thus, Congress does not offend the IRA when it so legislates, as the IRA does not modify Congress's independent authority over Indian trust land. And to the extent that specific trust land legislation may share subject matter with the IRA, general and specific legislation on the same issue work in harmony. It is a basic rule of statutory construction that the specific governs the general, particularly when "Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2071 (2012) (internal citations and quotation marks omitted).

In sum, when Congress legislates to declare specific land to be in trust on behalf of Indians, it does so as a direct exercise of its Constitutional authority. When it does so, that land is therefore validly and conclusively held in trust.

**2. Congress exercised its independent plenary authority over Indian affairs when it "ratified and confirmed" the Bradley Tract's trust status**

Congress's decision to declare the Bradley Tract as in trust via the Gun Lake Act, therefore, is wholly unremarkable. Congress routinely enacts such specific legislation on behalf of specific tribes and need not concern itself with the IRA. Section A provides:

> In General – The land taken into trust by the United States for the benefit of the Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians and described as trust land in the final Notice of Determination of the Department of the Interior (70 Fed. Reg. 25596 (May 13, 2005))

> is reaffirmed as trust land, and the actions of the Secretary of the Interior taking that land into trust ***are ratified and confirmed***.

Pub. L. No. 113-179, 127 Stat. 1913 (emphasis added).

While the Act references the Secretary's 2005 trust acquisition, it facially does not legislate upon the Secretary's authority to effect the acquisition under the IRA. Instead, the Act "ratifies and confirms" the Secretary's actions in taking that land into trust. *Id*. It does not comment on the validity of the Secretary's trust acquisition. It simply "ratifie[s] and confirm[s]" it. *Id.*

Congress's use of "ratified and confirmed" is significant because it is a phrase that Congress uses in the Indian context to give conclusive legal effect to actions of the Executive Branch that it intends to give the force of law as function of its direct authority. *Bugenig v. Hoopa Valley Tribe*, 266 F.3d 1201, 1212-13 (9th Cir. 2001) (en banc), *cert. denied*, 535 U.S. 927 (2002). In *Bugenig*, the Ninth Circuit, sitting en banc, closely analyzed the phrase when it examined a federal statute that "ratified and confirmed" tribal documents previously authorized by the Secretary of Interior that purported to extend tribal jurisdiction over non-Indians on the Hoopa Reservation. *Bugenig*, 266 F.3d. at 1211-13.

The Ninth Circuit started with a straightforward textual interpretation, defining "ratification" as "the confirmation of a previous act [or] the affirmance of a previous act whereby the act is given effect as if originally authorized," (*id*. at 1212 (quoting Black's Law Dictionary 1135 (5th ed. 1979) (internal punctuation omitted))

and "confirmation" as "to give formal approval[, or t]he ratification or approval of executive acts by a legislature" (*id.* (quoting Black's Law Dictionary at 270) (internal punctuation omitted)). The Ninth Circuit concluded that "[r]eferring to the ordinary legal significance of the terms, when Congress 'ratified and confirmed' the governing documents that were heretofore recognized by the Secretary, Congress was authorizing, giving effect to, and formally approving the [documents]." *Id.* Reviewing the historical use of "ratify and confirm" in Indian legislation, moreover, the Court confirmed this plain meaning as the phrase repeatedly occurs in legislation giving the force of law to agreements between the Executive Branch and the Indian tribe. *Id.* (citing Act of Feb. 28, 1877, 19 Stat. 254; Act of Mar. 3, 1891, 26 Stat. 1027, 1029; Curtis Act, 30 Stat. 495). The Ninth Circuit finally observed that Congress explicitly has been on notice that the effect of such language is to give unequivocal legal effect to Secretarial actions since the United States Supreme Court's decision in *Antoine v. Washington*, 420 U.S. 194, a decision that is particularly instructive here. *Id.* at 1213.

In *Antoine*, the Supreme Court considered the effect of a federal statute that "ratified" an 1891 agreement between the Executive Branch and the Colville Tribe that was intended to preserve Indian hunting and fishing rights on lands ceded by the Indians. *Antoine*, 420 U.S. at 201-04. The Washington Supreme Court had held below that the agreement lacked the force of law because the Executive Branch was

not authorized to contract with the Colville Tribe in 1891 as Congress had ended treaty making with the Indians in the Act of 1871 (16 Stat. 544, 566). *Antoine*, 420 U.S. at 197-202. The Washington Supreme Court reasoned that, because the Executive Branch lacked the authority to enter into treaties with tribes following the Act of 1871, Congress could not give legal effect to the 1891 agreement—the same basic fallacious notion upon which Mr. Patchak has premised his argument here (Opening Br. at 22, 24). *Antoine*, 420 U.S. at 197-202.

The Supreme Court reversed. The Court explained that when Congress ratifies and confirms actions of the Executive Branch regarding Indian affairs, it does so "as the exercise . . . of its 'plenary power . . . to deal with the special problems of Indians that is drawn both explicitly and implicitly from the Constitution itself.'" *Id.* at 204 (quoting *Morton v. Mancari*, 417 U.S. 535, 551-52 (1974)). Separate legislation that may call into question the Executive Branch's authority to take the action that Congress had ratified and confirmed, "in no way affect[s] Congress' plenary powers to legislate on problems of Indians, including legislating the ratification [of the Executive Action]." *Id.* at 203. Regardless of the Executive's authority to act with regard to Indians, "[o]nce ratified by Act of Congress, the [actions of the Executive branch] become law, and like treaties, the supreme law of the land." *Id.* at 204. The Court emphasized that ultimately the validity of the underlying Executive branch action that Congress has "ratified" is irrelevant where

Congress could have enacted the substance of the Executive Action as a direct function of its plenary authority over Indian affairs and irrespective of any Executive action.[6] *Id*.

Congress was well aware of its power to "ratify and confirm" Executive action when it enacted the Gun Lake Act. *See Bugenig*, 266 F.3d at 1213 (citing *Antoine*, 420 U.S. at 204). As there is no question that Congress could have taken the Bradley Tract into trust as a direct exercise of its plenary authority over Indian trust land, then under *Antoine* there is likewise no question that Congress could give the 2005 Notice of Decision conclusive legal effect irrespective of the Secretary's authority to take the Bradley Tract into trust under the IRA. *See Antoine*, 420 U.S. at 204.

Section A of the Gun Lake Act, therefore, conclusively and validly defines the Bradley Tract as in trust as a function of Congress's plenary and exclusive authority over Indian lands and wholly apart from authority delegated to the Secretary in the IRA. The instant controversy hinges upon whether the Bradley Tract lawfully is held in trust; therefore, Mr. Patchak's challenge fails based solely on Congress's substantive enactment in Section A. This Court, therefore, must

[6] This general principle also inheres outside of the Indian context as courts have long held that Congress may properly ratify agency action, even if the action was not authorized when taken. *E.g.*, *Swayne & Hoyt v. United States*, 300 U.S. 297, 301-02 (1937) ("It is well settled that Congress may, by enactment not otherwise inappropriate, ratify acts which it might have authorized, and give the force of law to official action unauthorized when taken.") (internal citations and punctuation omitted).

inquire no further in order to uphold the district court's order dismissing Mr. Patchak's appeal. Nevertheless, the Act soundly withstands Patchak's additional constitutional challenges as set forth below.

## II. The Gun Lake Act Does Not Violate the Constitution

### A. General Interpretative Standards and Standard of Review

It is well-settled that federal statutes are presumed to be constitutional. *E.g.*, *Bowen v. Kendrick*, 487 U.S. 589, 617 (1988). Only "the most compelling constitutional reasons" may justify "invalidat[ion of] a statutory provision that has been approved by both Houses of Congress and signed by the President . . . ." *Mistretta v. United States*, 488 U.S. 361, 384 (1989). Consequently, "the burden of establishing unconstitutionality is on the challenger," (*Miss. Comm'n on Envtl. Quality v. EPA*, 790 F.3d 138, 178 (D.C. Cir. 2015) (citing *United States v. Morrison*, 529 U.S. 598, 607 (2000); *United States v. Bland*, 472 F.2d 1329, 1334 (D.C. Cir. 1972)), and courts have characterized the burden of overcoming the presumption of constitutionality as "an extremely heavy burden . . . ." (*United States v. Turner*, 337 F. Supp. 1045, 1047 (D.D.C. 1972)). Further, where there is more than one possible interpretation of a statute, it is a court's "plain duty [] to adopt that which will save the act." *Cobell v. Norton*, 392 F.3d 461, 467 (D.C. Cir. 2004) (quoting *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 30 (1937); *see also Bowen*, 487 U.S. at 617.

### B. Argument

In light of the clear substantive effect of Section A of the Act to defeat Patchak's challenge to the Bradley Tract's trust status in its entirety, this Court need not even consider Section B, by which Congress has divested the judiciary of jurisdiction to hear any now futile challenges.[7] Nevertheless, Patchak's four constitutional claims derive from Section B of the Gun Lake Act, which provides:

> No Claims—Notwithstanding any other provision of law, an action (including an action pending in a Federal court as of the date of enactment of this Act) relating to the land described in subsection (a) shall not be filed or maintained in a Federal court and shall be promptly dismissed.

Pub. L. 113-179, 128 Stat. 1913. Mr. Patchak bears the "extremely heavy burden" of establishing that the Act is unconstitutional (*see Miss Comm'n on Envtl. Quality*, 790 F.3d at 178; *Turner*, 337 F. Supp. at 1047), and yet each of his constitutional challenges is characterized by an almost complete lack substantive support or legal analysis. This is because Congress properly has exercised its authority to both enact

[7] Nevertheless, the Gun Lake Act is so sound that Section B is ***also*** sufficient standing alone to defeat Patchak's appeal, as it is fundamental that the courts enjoy jurisdiction to hear challenges to agency action only by virtue of the express waiver of the United States' sovereign immunity in the APA, 5 U.S.C. § 702. *E.g.*, *Dept. of Army v. Blue Fox, Inc.*, 525 U.S. 255, 260-61 (1999). Consequently, when Congress precludes that review, it withdraws its waiver, and jurisdiction no longer exists. *See, e.g.*, *National Coalition to Save Our Mall v. Norton*, 269 F.3d 1092 (D.C. Cir. 2001).

a substantive rule in Section A and to divest the judiciary of jurisdiction in Section B. As set forth below, all of Patchak's constitutional challenges fail.

### 1. The Gun Lake Act Does Not Violate Constitutional Separation of Powers

The Constitution prohibits Congress from enacting legislation that "prescribe[s] rules of decision to the Judicial Department of the government in cases pending before it[.]" *United States v. Klein*, 80 U.S. 128, 146 (1871). However, Congress does not violate constitutional separation of powers when it "'amends applicable law.'" *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218 (1995) (quoting *Robertson,* 503 U.S. at 441 (internal punctuation omitted). A statute that "compel[s] changes in law, not findings or results under old law," and does not "direct particular findings of fact or applications of law, old or new, to fact," does not intrude upon the province of the judiciary. *Robertson*, 503 U.S. at 438. Provided a statute has effected a substantive change, Congress clearly may direct the court to act as it is axiomatic that courts are always bound to follow applicable statutory directives. *Id.* at 439.

Patchak bases his separation of powers argument upon the erroneous assumption that the Act requires the judiciary to render a finding that the Secretary's 2005 trust acquisition was consistent with the limitations set forth in Section 19 of the IRA. The Act does no such thing. When Congress, "ratified and confirmed" the Secretary's trust acquisition it did so as a ***direct and independent exercise of its***

***plenary authority.*** *See Antoine*, 420 U.S. at 204. The mere "ratification and confirmation" is itself a substantive enactment defining the Bradley Tract as in trust. There is nothing, therefore, for this Court to decide with regard to the Secretary's authority under the IRA. Simply put, Section B does not require any findings under old law; rather it merely directs this Court to act consistent with the new law in Section A. Mr. Patchak's assertions to the contrary defy both the plain text of the statute and the authorities that govern Congress's power to legislate as to Indian affairs.

Patchak further seems to claim, again without support, that this Court can only evaluate this controversy under the IRA and the APA such that Congress was required to amend those statutes in order to affect the Bradley Tract.[8] Yet he does not allege that Congress may not directly and independently create or define trust land. And he does not allege that Section 19 of the IRA binds Congress. At best, he suggests that the IRA and the APA must continue to govern this case simply because ***he*** originally brought this suit alleging violations of those statutes. Opening Br. at 24. To accept this argument would be to accept the absurd proposition that

[8] Congress explicitly considered and rejected amending the IRA to account for limitations upon the Secretary's trust acquisition authority arising from *Carcieri*, choosing instead to "ratif[y] the trust status of a discrete parcel of land." H.R. Rep. No. 113-590 at 2 (2014). Congress, of course, is free to target specific problems with specific solutions without amending a general statutory scheme. *See RadLAX Gateway Hotel, LLC*, 132 S. Ct. at 2070.

the mere filing of this lawsuit could prohibit Congress from freely exercising its constitutionally-derived power over Indian affairs. Such a theory plainly must fail.

And where Patchak finds no support for his separation of powers theory,[9] this Court's decision in *National Coalition to Save Our Mall v. Norton*, 269 F.3d 1092 (D.C. Cir. 2001) soundly defeats it. In *National Coalition*, plaintiffs sued the Secretary of Interior, inter alia, challenging agency approval of the construction of a proposed World War II Memorial under various federal statutes governing agency authority. *Nat'l Coalition*, 269 F.3d. at 1093. While this litigation was pending in the district court, Congress enacted legislation containing provisions that mirror the Gun Lake Act: (1) ***affirmation*** of the existing agency decision by directing that the Memorial "shall be constructed expeditiously . . . in a manner consistent with [existing plans] and permits"; (2) ***ratification*** of existing agency actions consistent with the decision to build the memorial; and (3) ***prohibition on judicial review*** of

[9] Patchak's attempt to support his theory with an unexplicated string-cite to various separation of powers cases fails. Opening Br. at 28 (citing *Roeder v. Islamic Republic of Iran*, 195 F.Supp.2d 140, 164 (D. D.C. 2002) *aff'd*, 333 F.3d 228 (D.C. Cir. 2003); *Paramount Health Sys., Inc. v. Wright*, 138 F.3d 706, 710 (7th Cir. 1998); *Ruiz v. United States*, 243 F.3d 941 (5th Cir. 2001); *Hadix v. Johnson*, 144 F.3d 925 (6th Cir. 1998)). The cited authorities, which bear no factual similarities to the instant case, are not on point and simply stand for the unremarkable proposition that "Congress cannot direct the outcome of a pending case without changing the law applicable to that case," a rule that Patchak cannot prove has been violated here. *Paramount Health Sys., Inc.*, 138 F.3d at 710 (citing *Plaut*, 514 U.S. at 218; *Robertson*, 503 U.S. at 441); *see also Roeder*, 195 F.Supp.2d at 164-66; *Ruiz*, 243 F.3d at 948-49; *Hadix*, 144 F.3d at 939-40.

the agency decision permitting construction of the memorial. *Id*. at 1094 (quoting Pub. L. No. 107-111).

Plaintiffs objected to the legislation on two bases: first, that the legislation violated the presumption in favor of judicial review of agency decisions; and, second, that the legislation violated separation of powers. *Id*. at 1094-96. As to judicial review, the court held that "the presumption is only that, and can be overridden by specific language or by clear and convincing evidence of legislative intent." *Id*. at 1095 (citing *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986)). Congress's facial prohibition of judicial review was sufficient by itself to demonstrate convincing legislative intent to override the presumption and to divest the court of jurisdiction. *Id.*, 269 F.3d at 1095 ("It is hard to see how Congress could make it clearer than it has here, providing that [the agency decision] 'shall not be subject to judicial review.'"). Of course, this is a foundational principle of federal jurisdiction. Federal courts enjoy jurisdiction only by virtue of Congress's plenary authority, and as a consequence, "the jurisdiction having been conferred may, at the will of Congress, be taken away in whole or in part." *Kline v. Burke Constr. Co.*, 260 U.S. 226, 234 (1922). Such enactments validly circumscribe courts' jurisdiction; they do not mandate a particular decision on the merits.

Critically, *National Coalition* further held that the subject legislation did not violate separation of powers under *Klein*. The Court determined that Congress's

***affirmation*** of the existing agency decision and ***ratification*** of previous and future agency actions amended the substantive law. *Nat'l Coalition*, 269 F.3d at 1097 (citing *Robertson*, 503 U.S. 429). And where such a substantive rule exists, a statute's narrow application to a single litigation, even Congress's explicit reference to a pending case, does not violate constitutional separation of powers. *Id*. Indeed, echoing the Supreme Court, *National Coalition* emphasized that courts are ***required*** to apply retroactive legislation to pending litigations where the new legislation would affect the outcome, provided no final judgment has yet issued. *Id*. at 1096 (citing *Plaut*, 514 U.S. at 226 ((citing *United States v. Schooner Peggy*, 1 Cranch 103 (1801)); *Robertson*, 503 U.S. at 439.

Patchak's feeble effort to distinguish *National Coalition* proves unavailing. Patchak contends that it is significant that *National Coalition* distinguished *Klein* on the grounds that the *Klein* statute was also "'liable to just exception as impairing the effect of a pardon, and thus infringing the constitutional Power of the Executive,'" where plaintiffs in *National Coalition* had not raised any other constitutional objections. Opening Br. (citing *Nat'l Coalition*, 269 F.3d at 1096). Patchak claims, therefore, that *National Coalition* does not apply here because he has raised other constitutional objections to the Gun Lake Act. *Id*. at 27. Again, Patchak overstates his own significance. *National Coalition* distinguished *Klein* on the grounds that, in addition to the separation of powers issue, the statute was liable to other "***just***

***exception***" arising from the constitution. *Nat'l Coalition*, 269 F.2d at 1096 (quoting *Klein*, 80 U.S. at 147) (emphasis added). Merely raising other constitutional objections can have no impact on the merits of Mr. Patchak's separation of powers claim unless they are, in fact, ***just exceptions***, which they are not, as set forth in parts II (B) (2)–(4), *infra*.

*National Coalition* is on all fours with this case. Like the *National Coalition* statute, the Gun Lake Act affirmed and ratified an existing agency action as a function of substantive law effectively resolving a pending litigation. *See id.* at 1095-97. Likewise, the Act precluded judicial review, withdrawing the United States' limited waiver of immunity under the APA, and divesting the courts of jurisdiction this case. See *id.* As this Court in *National Mall* and the district court below held, such legislation does not violate the Court's Article III powers.

### 2. The Gun Lake Act Does Not Violate the First Amendment

The crux of Mr. Patchak's First Amendment claim is the unfounded notion that the Petition Clause of the First Amendment should entitle him to pursue a lawsuit in which he legally may not prevail. The Constitution "protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes" as "the right of access to courts for redress of wrongs is an aspect of the First Amendment right to petition the government." *Borough of Duryea v. Guarnieri*, 131 S. Ct. 2488, 2494 (2011) (internal citations omitted).

Government action that effectively precludes parties from bringing otherwise worthy claims, therefore, violates the First Amendment. *E.g., Bill Johnson's Rests., Inc.*, 461 U.S. at 737-47.

The converse, of course, is also true. Claims that lack a "reasonable basis . . . are not within the scope of First Amendment protection." *Id.* at 743. *Bill Johnson's* considered whether the Petition Clause barred the NLRB from enjoining an employer's allegedly retaliatory lawsuit against an employee. The Supreme Court held that the First Amendment prohibits the government from denying a party access to file and prosecute "a well-founded lawsuit." *Id.* at 743. Whether this constitutional protection applies depends upon the threshold question of whether the lawsuit has a reasonable basis. *Id.* at 744. "If the plaintiff's position is plainly foreclosed as a matter of law," then a government action that bars the suit is not unconstitutional. *Id*. at 747. As issues of fact and law existed as to the underlying state court litigation, the NLRB's injunction was unconstitutional. *See id*. at 748-49.

As discussed at length in part I (B) *supra*, by enacting Section A of the Gun Lake Act, Congress has "plainly foreclosed" Patchak's sole claim in this lawsuit—that the Bradley Tract is not lawfully held in trust. *See id*. at 747. Patchak could not have prevailed in this suit as a matter of law even if Congress had not included Section B. The protections of the Petition Clause, therefore, do not apply here as

"baseless litigation is not immunized by the First Amendment." *Id.* at 743. Moreover, the Act only precludes Patchak from challenging the Bradley Tract in the federal courts. He remains free to petition any federal agency or to bring a lawsuit on any theory in a non-federal court to challenge the casino that is the subject of his Complaint. *See Am. Bus. Ass'n v. Rogoff*, 649 F.3d 734, 741 (D.C. Cir. 2011) (finding that the First Amendment was not violated when plaintiff retained other avenues for relief).

Further, although Patchak cites a handful of Petition Clause cases for basic propositions, no authority supports his position that the Petition Clause prohibits Congress from withdrawing a court's jurisdiction to hear a particular case. He briefly mentions the Supreme Court's ruling that Patchak has ***standing*** to bring the instant claim (*Patchak*, 132 S. Ct. 1299), but fails to explain what this has to do with anything. Opening Br. at 31. Likewise, Patchak's glancing reference to the presumptive reviewability of agency actions does not overcome the well-established rule that "the presumption is only that, and can be overridden by specific language or by clear and convincing evidence of legislative intent." *Nat'l Coalition*, 269 F.3d at 1095 (citing *Bowen*, 476 U.S. at 671-73).

None of Mr. Patchak's arguments are sufficient to meet his burden of proving that the Gun Lake Act has violated his First Amendment Right to Petition.

### 3. The Gun Lake Act Does Not Violate Mr. Patchak's Fifth Amendment Right to Due Process

Patchak's claim that the Act violates his Fifth Amendment right to due process of law lacks any merit whatsoever. The due process question is governed by a two-part inquiry: "whether [plaintiff] was deprived of a protected [property] interest and, if so, what process was his due." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982). While a cause of action can constitute a "species of property" that would be protected by due process (*see id*. at 428-29), it is well-settled that a party's property right in any cause of action does not vest until a ***final unreviewable judgment is obtained.*** *E.g., McCullough v. Commonwealth of Va.*, 172 U.S. 102, 123-24 (1898); *Daylo*, 501 F.2d at 816; *de Rodulfa v. United States*, 461 F.2d 1240, 1252-53 (D.C. Cir. 1972); *see also Plaut*, 1 F.3d 1487, 1493 n. 12 (6thCir. 1993), *aff'd*, *Plaut*, 514 U.S. 211. Specifically, a party's right to due process does not attach until the proceeding has been "***terminated*** by a final judgment." *de Rudolfa*, 461 F.2d at 1252 (citing *inter alia McCullough*, 172 U.S. at 123-24). "[T]he reason [a] . . . cause of action is not a vested property interest for Takings Clause purposes until it results in a 'final unreviewable judgment,' is that it is inchoate and does not provide a certain expectation in that property interest." *Bowers v. Whitman*, 671 F.3d 905, 914 (9th Cir. 2012); *accord Adams v. Hinchman*, 154 F.3d 420, 424 (D.C. Cir. 1998).

Mr. Patchak seems to argue the Supreme Court's ruling that he has standing to bring this suit (*Patchak*, 132 S. Ct. 2199), represents a final unreviewable judgment that constitutes a protected property interest. Apparently blind to the accepted meaning of a final judgment,[10] he claims that the Act has "eviscerated the finality" of that decision and, therefore, violates his due process rights. Opening Br. at 36. However, while the Supreme Court's ruling in *Patchak* was the last word on whether Mr. Patchak had ***standing*** to bring this suit, it was not a final unreviewable judgment that "settles the rights of the parties and dispose of all issues in controversy." *See* Judgment, Black's Law Dictionary (10th ed. 2014). A ruling that a party has standing simply means that the court *may* "decide the merits of the dispute or of particular issues," and that the party has satisfied "the threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

No legal entitlement could be more inchoate or uncertain regarding expectation in a property interest than a finding that a party has standing to sue. *See Bowers*, 671 F.3d at 914. And Patchak can muster no authority that says otherwise. Patchak's reference to *Martinez v. California*, offers no help because the *Martinez*

[10] Black's Law Dictionary defines a final judgment as "[a] court's last action that settles the rights of the parties and disposes of all issues in controversy, except for the award of costs (and, sometimes, attorney's fees) and enforcement of the judgment." Judgment, Black's Law Dictionary (10th ed. 2014).

Court refused to consider whether the right to sue actually constituted a "species of property," posing that notion as a mere hypothetical. 444 U.S. 277 at 281-82 (1980). Further, Patchak's bizarre recitation of various other kinds of unrelated property rights (horse trainer's license, high school education, driver's license, welfare benefits, etc.) adds nothing to this analysis.

The Supreme Court has held only that Patchak has met the threshold requirement for bringing a lawsuit to challenge the Bradley Tract's trust status. *Patchak*, 132 S. Ct. 2199. No final unreviewable judgment has issued. Mr. Patchak has no vested property interest in this litigation. His Fifth Amendment claim fails.

### 4. The Gun Lake Act Is Not a Bill of Attainder

Congress explicitly enacted the Gun Lake Act to provide the Tribe with "certainty to the legal status of the land" that comprises the Tribe's homeland, upon which it relies for economic development, and which had been "place[d] in jeopardy" by the instant litigation. S. Rep. 113-194 at 2 (2014). In light of this plainly nonpunitive legislative purpose and the absence of any legislative intent to punish Mr. Patchak, his claim that the Gun Lake Act is an unlawful bill of attainder fails.

Article I, section 9 of the Constitution, the Bill of Attainder Clause, prohibits Congress from enacting "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a

judicial trial." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 468 (1977). A law is an unconstitutional bill of attainder "if it (1) applies with specificity, and (2) imposes punishment." *BellSouth Corp v. FCC*, 162 F.3d 678, 683 (D.C. Cir. 1998) ("*BellSouth II*"). Specificity alone does not render a statute a bill of attainder. *Nixon*, 433 U.S. at 472. Even statutes that specifically name particular parties do not constitute bills of attainder where the punishment element has not also been satisfied. *BellSouth II*, 162 F.3d at 684.

The Supreme Court has set forth a three-part inquiry to determine whether legislation constitutes punishment in the bill of attainder analysis:

> (1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, "viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes"; and (3) whether the legislative record "evinces a congressional intent to punish."

*Selective Serv. Sys.*, 468 U.S. at 852 (quoting *Nixon*, 433 U.S. at 473) (internal quotation marks omitted). While each punishment factor is considered separately, the second factor, the "functional test," "'invariably appears to be the most important of the three.'" *Foretich v. United States*, 351 F.3d 1198, 1218 (D. D.C. 2003) (quoting *BellSouth Corp. v. FCC*, 144 F.3d 58, 65 (D.C. Cir. 1998) ("*BellSouth I*") and *BellSouth II*, 162 F.3d at 684). "Indeed, compelling proof on this score may be determinative." *Id.* (citing *BellSouth I*, 144 F.3d at 65).

Courts define "historical punishment" narrowly, generally limiting it to sentences of death, bills of pains and penalties, legislative bars to participation by individuals or groups in specific employments or professions, or notes of infamy that mark individuals as infamous or disloyal. *Foretich*, 351 F.3d at 1218-20 (citing *BellSouth II*, 162 F.3d at 685; *Nixon*, 433 U.S. at 474). Here, the Act works to prevent Mr. Patchak from further challenging the trust status of land that is critical to the Tribe's economic development and self-sufficiency. Even Patchak's characterization of the Act, as thwarting his efforts to defend enjoyment of his property, does not remotely fall into the category of a traditional "historical punishment," and as such fails to satisfy the first test of punishment. *See Foretich*, 351 F.3d at 1218-20.

The functional test requires a "nonpunitive legislative purpose," because "[w]here such legitimate legislative purposes do not appear, it is reasonable to conclude that punishment of individuals disadvantaged by the enactment was the purpose of the decisionmakers." *Nixon*, 433 U.S. at 475-76. Courts determine the existence of a nonpunitive legislative purpose "by examining both the purported ends of contested legislation and the means employed to achieve those ends." *Foretich*, 351 F.3d at 1221. The statute must demonstrate "a nexus between the legislative means and legitimate nonpunitive ends." *Id*. at 1222 (citing *Selective Serv. Sys.*, 468 U.S. at 854; *BellSouth II*, 162 F.3d at 687-88). A court must also

"weigh the purported nonpunitive purpose of statute against the magnitude of burden it inflicts." *Id*. (citing *Nixon*, 433 U.S. at 475-76). An "extraordinary imbalance" must exist "between the burden imposed and the alleged nonpunitive purpose" if the burden is to outweigh the legitimate legislative purpose. *Id*. at 1223.

The legislative history is clear that Congress intended the Act to affirm the Bradley Tract's trust status as a function of its fiduciary duty to the Tribe by definitively resolving a dispute that had "place[d] in jeopardy the Tribe's only tract of land held in trust and the economic development project that the Tribe is currently operating on the land." S. Rep. No. 113-194, at 2. Congress considered both the value of the legislation to the Tribe and to the non-Indian community that surrounds the trust land and which relies upon it for jobs and revenues. Cong. Rec H7485 (daily ed. Sept. 15, 2014) (statement of Reps. Grijalva & Upton). To resolve the uncertainty clouding the Bradley Tract, Congress (a) declared the Bradley Tract as conclusively in trust and (b) divested the judiciary of jurisdiction to hear further challenges to the trust status. Pub. L. No. 113-179, 128 Stat. 1913. A clear nexus exists, therefore, between the ends in this matter and the means used to achieve them. *See Foretich*, 351 F.3d at 1222. This nexus, moreover, is at least as strong as the nexus between barring a corporation from offering certain services and the goal of general commercial regulation (*see, generally BellSouth I*, 144 F.3d 58; *BellSouth II*, 162 F.3d 678); or the nexus between prohibiting one nonprofit from receiving

federal grant monies and Congress's desire to ensure effective expenditure of taxpayer dollars (*see, generally ACORN v. United States*, 618 F.3d 125 (2d Cir. 2010)).

Further, weighing the magnitude of the burden that the Act imposes upon Patchak against the Act's purpose is even more compelling. The burden upon Mr. Patchak is an alleged impairment of his enjoyment and the value of his ***private property***.[11] JA A19. The Act's purpose is to provide a homeland and self-sufficiency for a ***sovereign Indian tribe*** consistent with Congress's inherent fiduciary duty to the Tribe. *See* S. Rep. No. 113-194, at 2. Congress also intended the Act to preserve jobs created by the casino and to safeguard significant revenues the Tribe shares with local government and local schools, "an incredible feat" and "quite the advantage in a time when municipalities are slashing services due to deficits." Cong. Rec. H7485 (daily ed. Sept. 14, 2014) (statement of Rep. Upton). The burden and the legislative purpose in this matter, standing side-by-side, speak for themselves. Moreover, a legislative purpose that serves a worthy government interest nearly always wins out over private interests—even private interests that are broader than Mr. Patchak's. *See, e.g., SeaRiver Mar. Fin. Holdings, Inc. v. Mineta*,

[11] Notably, the actual impairment alleged is minimal. The administrative record revealed that Patchak's residence is some distance from the Bradley Tract and increased traffic near his residence was expected to increase by no more than two cars per minute during peak hours. *See* JA A17-A27; SJA 3-4.

309 F.3d 662, 674-76 (9th Cir. 2002) (weighing a shipping corporation's economic right against avoidance of a catastrophic oil spill); *BellSouth I*, 144 F.3d at 120-23 & *BellSouth II*, 162 F.3d at 688-90 (weighing a corporation's ability to participate in a given industry and general commercial regulation); *Selective Serv. Sys.*, 468 U.S. 854-56 (weighing students' right to federal financial aid against compulsory military service).

The functional test finally considers the scope and structure of the legislation, and the Act survives this inquiry, too. While the Act does not include any safeguards designed to protect Mr. Patchak, which the Supreme Court discussed in *Nixon* (433 U.S. at 477), it would be impossible to achieve Congress's goal of providing legal certainty to the Bradley Tract's trust status while still enabling Patchak to pursue this litigation. And structurally, the fact that less burdensome alternatives were not available to Congress bolsters the validity of a nonpunitive purpose. *See Nixon*, 433 U.S. at 482; *SeaRiver*, 309 F.3d at 677-78; *Consol. Edison Co. of N.Y. v. Pataki*, 292 F.3d 338, 354 (2d Cir. 2002). Hence, the Act is both substantively and structurally nonpunitive.

The final test of legislative punishment is the "motivational test," and it examines "whether the legislative record evinces a congressional intent to punish." *Nixon*, 433 U.S. at 478 (citing *United States v. Lovett*, 328 U.S. 303, 308-14 (1946). Courts applying this test must determine whether Congress has "intend[ed] [to]

encroach[]on the judicial function of punishing an individual for blameworthy offenses." *Id*. at 479. While "a formal legislative announcement of moral blameworthiness or punishment is not necessary to an unlawful bill of attainder, the absence of such expressions in the legislative history tends to demonstrate nonpunitive intentions. *Id*. at 481.

The legislative record evinces no congressional intent to punish Mr. Patchak. Congress discusses his lawsuit several times, but it never demonstrates a desire "to encroach on the judicial function of punishing an individual for blameworthy offenses" or announcing "moral blameworthiness." *See Nixon*, 433 U.S. at 479-80. Both houses of Congress referred to this litigation only to note the importance of remedying the peril that it potentially had caused the Tribe. H.R. Rep. No. 113-590, 2 (2014); S. Rep. No. 113-194, at 2 (2014). Further, while Mr. Patchak's lawsuit was characterized as "frivolous" during House floor debates on the Act (a characterization that the Tribe does not here dispute), the focus remained properly upon the impact of the litigation on the well-being of the Tribe, its members and employees, and State and local governments. *See* Cong. Rec. H7485 (daily ed. Sept. 15, 2014) (statement of Reps. Hastings & Grijalva).

Patchak makes almost no effort to connect his claim that the Act constitutes a bill of attainder to these binding authorities and analyses. At best, he suggests that the Act is punitive because it is directed at Mr. Patchak's suit, a circular argument

that is wholly unsupported. The burden of proving that the Gun Lake Act is unconstitutional is Mr. Patchak's burden, and it is a burden that he has not met. *See Miss. Comm'n on Entl. Quality*, 790 F.3d at 178. The Gun Lake Act is not a bill of attainder.

### 5. A Finding of Unconstitutionality in Section B of the Act Does Not Invalidate the Act, as Section B is Severable

Mr. Patchak's constitutional challenges arise from Section B, which directed the district court to dismiss this lawsuit. Patchak has made no colorable challenge to Congress's authority to enact Section A, which conclusively establishes that the Bradley Tract is in trust. Even if this Court is persuaded by Patchak's constitutional arguments regarding Section B, Section B is severable from the balance of the Act, and the remainder of the Act must be held to be valid. *E.g. Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987). As a general rule, "'a court should refrain from invalidating more of the statute than is necessary.'" *Id*. (quoting *Regan v. Time, Inc.*, 468 U.S. 641, 652 (1984)). If a statute contains "'unobjectionable provisions separable from those found to be unconstitutional, it is the duty of [the] court to so declare, and to maintain the act in so far as it is valid.'" *Id*. Further, "invalid portions of a statute are to be severed 'unless it is evident that the legislature would not have enacted those provisions which are within its power, independently of that which is not.'" *I.N.S. v. Chadha*, 462 U.S. 919, 931-32 (1983) (quoting *Buckley v. Valeo*, 424 U.S. 1, 108 (1976)).

Therefore, if this Court holds Section B to be unconstitutional, it is this Court's duty to declare that Section A is valid and maintain that Section A governs the instant proceeding. *See Alaska Airlines, Inc.*, 480 U.S at 684; *Regan*, 468 U.S. at 652. As Section A conclusively resolves Mr. Patchak's sole legal challenge here (whether the Bradley tract lawfully is held in trust), notwithstanding any constitutional issues with Section B, this Court must uphold the district court's ruling granting summary judgment in favor of the Tribe and the Secretary.

## III. This Court Cannot Reach the Merits of Patchak's Challenge Under the APA

### A. Standards of Review

Appellate courts review a district court's denial of summary judgment on an APA claim de novo. *Roberts v. United States*, 741 F.3d 152, 157-58 (D.C. Cir. 2014). A district court's ruling on a motion to strike the administrative record is reviewed for an abuse of discretion. *See Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008).

### B. Argument

As an initial matter, Patchak's attempts to put the merits of his APA claim and his Motion to Strike before this Court are improper. The district court below correctly declined to reach those issues as it held that it lacked jurisdiction. JA A275-294. Lacking a record, if this Court determines that jurisdiction exists for Patchak's APA challenge, it should remand to the district court despite the fact that its review is de novo. *See, e.g.*, *Tex. Rural Legal Aid, Inc. v. Legal Servs. Corp.*, 940 F.2d 685, 688 (D.C. Cir. 1991).

Nevertheless, this Court cannot rule on Patchak's APA claim as he has presented it, because he asks this Court to rule on whether the ***2005*** Notice of Decision meets criteria articulated for the first time in a ***2009*** Supreme Court decision. Courts cannot review agency decisions when an intervening law has changed the legal framework upon which the decision was based. In such

circumstances, the agency is required to issue a new decision before judicial review may proceed. *E.g*, *Nat'l Fuel Gas*, 899 F.2d at 1249; *Lorion*, 470 U.S. at 744. Consequently, if this Court determines that jurisdiction exists for Patchak's APA challenge, then it must remand to the district court either for briefing on the merits of the agency's *Carcieri* analysis contained in the 2014 Notice of Decision or for remand to the agency to apply *Carcieri* to the Bradley Tract trust acquisition. *See id.*

### 1. Judicial Review of the Secretary's 2005 Notice of Decision is Prohibited in Light of the Supreme Court's 2009 Decision in *Carcieri v. Salazar*

Chronology is important to understand here. The Secretary acquired the Bradley Tract in trust on ***May 13, 2005***, relying upon the long-accepted understanding that the IRA authorized trust acquisitions for ***all*** federally-recognized tribes. JA A22-A23; 70 Fed. Reg. 25596 (May 13, 2005); *see also* Cohen's Handbook of Federal Indian Law, § 15.07[1][a]. On ***February 24, 2009***, the Supreme Court issued *Carcieri*, holding that the IRA only authorized the Secretary to acquire trust land for tribes that were "under federal jurisdiction" in 1934. 555 U.S. at 395. As the term "under federal jurisdiction" in 1934 is ambiguous, the Solicitor of the Department of Interior promulgated a two-part inquiry intended to reach the question set forth in the Memorandum, The Meaning of "Under Federal Jurisdiction" for Purposes of the Indian Reorganization Act, issued on ***March 12,***

***2014***. 2014 WL 988828. On ***September 3, 2014***, the Secretary issued a new Notice of Decision, taking two new parcels of land into trust on behalf of the Gun Lake Tribe in which the Secretary analyzed ***for the first time*** whether the Gun Lake Tribe was under federal jurisdiction in 1934 pursuant to *Carcieri*. SAR000617-58.

When the new Notice of Decision issued, this lawsuit was pending in the district court on remand from the Supreme Court to consider this precise question—whether the Gun Lake Tribe was under federal jurisdiction in 1934 pursuant to *Carcieri*. *Patchak*, 132 S. Ct. 1299. One day after the new decision issued, the district court held a status conference at which Patchak's counsel requested a summary judgment briefing schedule. JA A256. The United States advised that briefing was premature as the Secretary had not issued an amended decision analyzing whether the Tribe was under federal jurisdiction in 1934 as to the Bradley Tract, but she noted the existence of the September 3, 2014 Notice of Decision which already had analyzed this precise question. JA A258-259. Patchak explicitly disagreed, and the court ordered summary judgment briefing to commence immediately. JA A265-A266.

On October 27, 2014, the United States filed its Lodging of Supplemental Administrative Record. JA A183-A186. Patchak moved to strike the 2014 Notice of Decision the same day, complaining that the 2014 Notice of Decision improperly supplemented the 2005 Notice of Decision. JA A229-A233. The United States

countered that the 2014 decision was instead a ***new agency decision*** directly relevant to the instant proceeding, as the Secretary had ruled that the Tribe was under federal jurisdiction in 1934; and further if the court excluded the new decision, then it must remand to the Secretary to issue a new decision specific to the Bradley Tract, as other courts analyzing post-*Carcieri* challenges to pre-*Carcieri* trust acquisitions had done. ECF No. 77 (citing *N.Y. v. Salazar*, No. 6:08-CV-00644, 2012 WL 4364452 (N.D.N.Y. Sept. 24, 2012)). The United States correctly noted, however, that because the "under federal jurisdiction" analysis depends on the Tribe rather than any specific parcel of land, any new Bradley Tract decision would be identical to the September 3, 2014 decision. *Id.* The district court did not issue a substantive ruling on the Motion to Strike prior to summary judgment briefing and ultimately declined to reach that issue. JA A275-A294.

Patchak's claim that judicial review may proceed on the 2005 decision and that a subsequent decision may not factor is improperly based on authorities that bar supplementation of extra-record facts to an old agency decision that was based on settled law. *See, e.g.*, *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971). Such authorities are not on point, because the governing law changed in 2009 and hence a new agency decision is required.

"[A]dministrative agencies have inherent power to reconsider their own decisions, since the power to decide in the first instance carries with it the power to

reconsider." *E.g. Sierra Club v. Van Antwerp*, 560 F. Supp. 2d 21, 23 (D. D.C. 2008) (citing *Trujillo v. Gen. Elec. Co.*, 621 F.2d 1084, 1086 (10th Cir. 1980)). Indeed, agencies are ***required*** to reconsider prior decisions where an intervening legal authority affects the substance of the agency's prior decision. *E.g. Nat'l Fuel Gas*, 899 F.2d at 1249; *see also Lorion*, 470 U.S. at 744. This is because a decision "is valid only as a determination of policy or judgment which the agency alone is authorized to make . . . .." *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943) . Courts may not "intrude upon the domain which Congress has exclusively entrusted to an administrative agency." *Id*.

Consequently, agencies must cure deficiencies arising in their decisions "rather than wasting the courts' and the parties' resources reviewing a record that both sides acknowledge to be incorrect or incomplete." *Ethyl Corp. v. Browner*, 989 F.2d 522, 524 (D.C. Cir. 1993) (citing *Lamprecht v. FCC*, 958 F.2d 382, 385 (D.C. Cir. 1992)). The agency must be permitted to "bring its expertise to bear upon the matter[,] [to] evaluate the evidence[,] [to] make an initial determination[,] and, in doing so, it can, through informed discussion and analysis, help a court later determine whether its decision exceeds the leeway that the law provides." *Ventura*, 537 U.S. at 17.

This Court considered similar circumstances in *National Fuel Gas Supply Corp.*, in which the Federal Energy Regulatory Commission had issued a ruling

against a corporation based upon legal authority that was subsequently overturned by this Court in a separate case. *Nat'l Fuel*, 899 F.2d at 1246-49. As here, the corporation challenged the ***old*** agency ruling under the ***new*** legal standard. *Id.* at 1249. The Court declined to hear the challenge and instead ordered the agency to reconsider its ruling in light of the new authority. *Id.* In light of the agency's expertise and its congressionally delegated power to decide the disputed matter, the Court held that it would be "inappropriate . . . to venture an assessment of the Commission's [decision] now that the legal background against which the Commission rendered its interpretation has been so dramatically . . . altered." *Id.* at 1249. Permitting the agency to reconsider "comports with the general principle that ***an agency should be afforded the first word on how an intervening change in law affects an agency decision pending review***." *Id.* at 1249-50 (citing *Panhandle E. Pipe Line Co. v. FERC*, 890 F.2d 435, 438-39 (D.C. Cir. 1989)) (emphasis added).

Even more to the point, in *New York v. Salazar*, as here, the court considered a *Carcieri*-based challenge to a pre-*Carcieri* trust acquisition. 2012 WL 4364452 at *11-17. Because the trust acquisition predated *Carcieri*, the Secretary had yet "to consider the *Carcieri* issue and arrive at an informed decision." *See id.* at *13. The court ruled that the pre-*Carcieri* decision was deficient and held that the Secretary must be permitted to reconsider the decision and specifically apply the new rule set forth in *Carcieri*. *Id.* at *12-14 (citing *Gonzales v. Thomas*, 547 U.S. 183, 186

(2006); *Ventura*, 537 U.S. at 16; *Lorion*, 470 U.S. at 744; *Chenery*. 318 U.S. at 87-88). The court emphasized that the Secretary "(via the BIA) has specific expertise that [courts] lack[]." *Id.* at *14 (citing *Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51, 59 (2d Cir. 1994); *United Tribe of Shawnee Indians v. United States*, 253 F.3d 543, 551 (10th Cir. 2001)); *accord*, *Muwekma Ohlone Tribe v. Kempthorne*, 452 F. Supp. 2d 105, 114-15 (D.D.C. 2006). As such the agency must be allowed to "determine[] the facts and decid[e] whether the facts as found fall within a statutory term." *Id.* at *15 (citing *Thomas*, 547 U.S. at 186). The agency can then "bring its expertise to bear upon the matter, it can evaluate the evidence, it can make an initial determination; and, in doing so, it can, through informed discussion and analysis, help a court later determine whether its decision exceeds the leeway the law provides." *Id.* (citing *Thomas*, 547 U.S. at 186-87).

Here, no one disputes that *Carcieri* changed "the legal background against which the [Secretary] rendered [her] interpretation" of whether the Secretary lawfully could take the Bradley Tract into trust on behalf of the Tribe. *See Nat'l Fuel*, 899 F.2d at 1249. Indeed, Patchak's entire APA theory relies upon it. *See, e.g.*, Opening Br. at 8 ("The *Carcieri* decision was of particular importance to the instant matter, because it interpreted key language in the [IRA], which is the same act under which Mr. Patchak's claims arose."). However, the law does not permit Patchak to bring a *Carcieri* challenge to a pre-*Carcieri* Notice of Decision nor does

it permit a court to review it. *See Nat'l Fuel*, 899 F.2d at 1249. To apply the 2009 *Carcieri* analysis to the 2005 pre-*Carcieri* decision would impermissibly "intrude upon the domain which Congress has exclusively entrusted to an administrative agency." *See Chenery*, 318 U.S. at 88. Consequently, any APA challenge to the Bradley Tract's trust status must be based upon the Secretary's post-*Carcieri* analysis of the Tribe's status in 1934. And as set forth below, Patchak's attempts to make an end run around this deficiency also fail.

### 2. Whether the Tribe Was Under Federal Jurisdiction in 1934 Requires the Secretary of Interior's Expertise as "Under Federal Jurisdiction" Is Ambiguous

Patchak attempts to sustain his now invalid challenge to the 2005 Notice of Decision in this appeal by arguing that the term "under federal jurisdiction" is unambiguous and can be equated to formal "federal recognition," such that the Tribe's reaffirmed federal recognition in 1999 resolves his APA claim. *See* Opening Br. at 19-22. This argument is both facile and false. *Carcieri* narrowly held "that the term 'now under Federal jurisdiction' in § 479 unambiguously refers to those tribes that were under the federal jurisdiction of the United States when the IRA was enacted in 1934." *Carcieri*, 555 U.S. at 395. The authorities agree that, while this clarified a ***temporal limitation*** on federal jurisdiction, it did not clarify the ***meaning*** of federal jurisdiction. *Stand Up for Cal.! v. U.S. Dept. of Interior*, 919 F. Supp. 2d 51, 66-67 (D.D.C. 2013); *No Casino in Plymouth v. Jewell*, No. 2:12-cv-01748, 2015

WL 5813694, *11-12 (E.D. Cal. Sep. 30, 2015); *Cent. N.Y. Fair Bus. Ass'n v. Jewell*, No. 6:08-cv-0660, 2015 WL 1400384, *7 (N.D.N.Y. Mar. 26, 2015); *Sandy Lake Band of Miss. Chippewa v. United States*, No. 00-2786, 2012 WL 1581078, *8, n.1 (D. Minn. May 4, 2012), *aff'd as modified by Sandy Lake Band of Miss. Chippewa v. United States*, 714 F.3d 1098 (8th Cir. 2013); *see also Confederated Tribes of Grand Ronde Cmty.of Or. v. Jewell*, 75 F. Supp. 3d 387, 398 (D. D.C. 2014). And, as Justice Breyer explained, whether a tribe was under federal jurisdiction in 1934 can be a complex question subject to an intensive factual inquiry. *See Carcieri*, 555 U.S. at 397-98 (Breyer, J., concurring).

Patchak's claim that *Carcieri* suggests that "'under federal jurisdiction' and 'federally recognized' are one and the same," is moreover a bald misstatement of the case. Opening Br. at 19. The only substantive discussion of the term "recognized" in *Carcieri* directly contradicts Patchak's claim. Justice Breyer's concurring opinion explicitly notes that recognition and jurisdiction may be treated as two separate concepts and states that Section 19 "imposes no time limit upon recognition." *Carcieri*, 555 U.S. at 399. Justice Souter agreed, noting that "[n]othing in the majority opinion forecloses the possibility that the two concepts, recognition and jurisdiction, may be given separate content" and that "the [IRA] imposes no time limit upon recognition." *Id.* at 400 (Souter, J. dissenting).

Unfortunately for Patchak, courts that have considered the term "under federal jurisdiction" since *Carcieri* uniformly have both regarded jurisdiction and recognition separately and held that "under federal jurisdiction" is ambiguous and requires explication by the Secretary of Interior. *Grand Ronde*, 75 F. Supp. 3d at 398; *Stand Up for Cal.!*, 919 F.Supp. at 66-67; *No Casino in Plymouth*, 2015 WL 5813694, *12; *Cent. N.Y. Fair Bus. Ass'n*, 2015 WL 1400384, *7; *Sandy Lake*, 2012 WL 1581078, *8. Consequently, the Department of Interior has established a fact-intensive analytical framework to reach the question of federal jurisdiction, to which reviewing courts apply *Chevron* deference. *See* Memorandum, 2014 WL 988828; *No Casino in Plymouth*, 2015 WL 5813694,*12; *Grand Ronde*, 75 F. Supp. 3d at 401-04.

The sheer inadequacy of the 2005 Notice of Decision and Patchak's "plain meaning" interpretation of "under federal jurisdiction" is borne out by the total absence of any arbitrary-and-capricious analysis in Patchak's appeal. *See generally* Opening Br. at 20-22. Indeed, his purported challenge to the 2005 Notice of Decision has nothing to do with any facts or agency interpretation in the 2005 Notice of Decision. *Id.* Instead, he relies upon "facts" that he thinks are dispositive of the Tribe's federal recognition status, but for which he cannot cite to the administrative record, except for one tribal member's statement during the public comment period. *Id.* at 20-22. He pulls the rest of the "facts" from exhibits filed in the early stages of

this litigation, including, outrageously, statements made by the Tribe and the Acting Assistant Secretary of Interior that post-date the Secretary's 2005 decision. *Id.* Patchak ignores completely that these "facts" were not before the agency when it rendered its decision in 2005 and, according to arguments in his own brief, should be excluded from consideration on judicial review. *Id.* at 40. Patchak simply cannot cobble together an arbitrary-and-capricious analysis based on *Carcieri* that could functionally be derived from the 2005 pre-*Carcieri* decision. The 2005 Notice of Decision is inadequate to provide a basis for judicial review.

### 3. Remand to the Agency to Issue a New Decision Is Not Necessary in Light of the Existence of the 2014 Notice of Decision

As set forth above, if this Court determines that jurisdiction exists for Patchak's APA challenge, then it must remand for consideration of a *Carcieri*-based agency decision. However, it need not order the agency to issue a new decision. The remand cases cited *supra*, contemplated a *remand* to the agency to allow the agency to reconsider its decision in light of the new authority governing its decision. *See, e.g.*, *Thomas*, 547 U.S. at 186; *Ventura*, 537 U.S. at 16; *Lorion*, 470 U.S. at 744; *Chenery*, 318 U.S. at 87-88; *Van Antwerp*, 560 F. Supp. 2d at 23; *Ethyl Corp.*, 989 F.2d at 523-24; *Nat'l Fuel*, 899 F.2d at 1249; *SKF USA Inc.*, 254 F.3d at 1028. A remand to the agency in this case, however, would run contrary to the notion that judicial review of an agency's decision must conserve the courts' and the parties' resources (*see Ethyl Corp.*, 989 F.2d at 523-24) because, here, the agency already

has brought its expertise to bear upon the question of whether the Tribe was under federal jurisdiction in 1934 consistent with *Carcieri*. SAR000617-58.

The 2014 Notice of Decision taking into trust two other parcels of land on behalf of the Tribe includes a detailed factual and legal analysis of whether the Gun Lake Tribe was under federal jurisdiction in 1934 as required by *Carcieri* and pursuant to the analytical framework established by the Department of Interior. SAR000617-58. Although the 2014 decision is not specific to the Bradley Tract, *Carcieri's* "under federal jurisdiction" inquiry is specific to the ***Tribe***, not to the land that is the subject of the trust acquisition. A remand to the agency thus would result in nothing more than re-issuance of the substance contained in the 2014 Notice of Decision.

Nevertheless, regardless of the scope of any remand, there is no question that neither this Court nor the district court below may review the 2005 Notice of Decision based upon the *Carcieri* decision.

## CONCLUSION

For the foregoing reasons the judgment below should be affirmed.

Dated: March 28, 2016

Respectfully submitted,

/s/ Conly J. Schulte

Conly J. Schulte
Fredericks Peebles & Morgan LLP
1900 Plaza Drive
Louisville, CO 80027
Tel: (303) 673-9600
Fax: (303) 673-9839
cschulte@ndnlaw.com

Nicole E. Ducheneaux
Fredericks Peebles & Morgan LLP
3610 North 163rd Plaza
Omaha, NE 68116
Tel: (402) 333-4053
Fax: (402) 333-4761
nducheneaux@ndnlaw.com

Attorneys for Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians

**CERTIFICATE OF COMPLIANCE**

This Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it has been prepared in a proportionally spaced typeface using in Times New Roman typeface with 14 point font and contains 13,899 words (excluding cover, tables, and certificate of service and compliance), according to the count of the computer program Microsoft Word used to prepare the brief.

/s/ Conly J. Schulte
Conly J. Schulte

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 28th day of March 2016, a copy of the foregoing was filed with the D.C. Circuit Clerk of the Court using CM/ECF. The original plus 8 copies were sent to the Court via Federal Express overnight delivery. The electronic filing prompted automatic service of the filing to counsel of record in this case who have obtained CM/ECF passwords. Two copies were sent via Federal Express overnight mail to:

Sharon Yvette Eubanks
7927 Jones Branch Drive, #2150
McLean, VA 22102
*Attorney for Plaintiff-Appellant*

Lane McFadden
U.S. DEPARTMENT OF JUSTICE
Environmental and Natural Resources Division
P.O. Box 7415 Ben Franklin Station
Washington, DC 20044
*Attorney for Defendant-Appellee*

/s/ Conly J. Schulte
Conly J. Schulte